J-A16027-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| RACHAEL KELSO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| IVAN KELSO | : | |
| | : | |
| Appellant | : | No. 1641 WDA 2025 |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOANNE SIROCHMAN KELSO | : | |

Appeal from the Order Entered November 24, 2025
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s): 24DO00990

BEFORE: McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: August 4, 2026**

Appellant, Ivan Kelso ("Father"), appeals from the custody order entered in the Westmoreland County Court of Common Pleas, which granted shared legal custody of K.K. ("Child") (born March 2018) to Rachael Kelso ("Mother") and Father, partial physical custody to Father, and no separate period of partial custody to Joanne Sirochman Kelso ("Paternal Grandmother"). We affirm.

The relevant facts and procedural history of this matter are as follows. The parties have a long and contentious history of dysfunction. Mother and

Father were married in April 2022, but had an acrimonious separation in January 2024, which included the filing and granting of three separate petitions pursuant to the Protection From Abuse ("PFA") Act.[1] The final petition resulted in a no-contact order that expired in July 2025. Father is a recovering alcoholic and has been diagnosed with Intermittent Explosive Disorder; he lives with Paternal Grandmother. Currently, the parties are divorced, and Mother is engaged to Shiloh Law, with whom she has a child.

On June 24, 2024, Mother initiated this action by custody complaint. On August 9, 2024, the court issued a temporary order awarding sole legal and primary physical custody to Mother; as a result of his issues with alcohol, Father was awarded supervised partial physical custody, as the parties may agree, with Paternal Grandmother serving as the supervisor. Subsequently, the parties commenced voluminous and protracted litigation, which included numerous emergency motions, petitions for contempt, and other requests prior to the final trial.

Ultimately, Father requested a pre-trial conference before the court and additionally filed a petition for contempt against Mother. Following a hearing, on October 17, 2024, the court amended the temporary custody order, awarding Mother sole legal and primary physical custody and Father a set schedule for supervised periods of partial custody. The parties were ordered

---

[1] 23 Pa.C.S.A. §§ 6101-6122.

to communicate on Our Family Wizard, and Father was awarded weekly telephone calls with Child.

On December 23, 2024, Mother filed a petition for emergency custody, alleging that Father and Paternal Grandmother were smoking around Child, and that Paternal Grandmother made Child urinate in a cup. Following review, the court temporarily suspended Father's periods of supervised partial custody, as Paternal Grandmother had been acting as a supervisor, pending a more formal review.

On January 8, 2025, Paternal Grandmother filed a petition to intervene. That same day, the court convened a hearing on the emergency petition. Mother testified that Child had informed her that, during the visit, Paternal Grandmother bought Child into the bathroom and made her "pee in something." (*See* N.T. Hearing, 1/8/25, at 10). Father's counsel stated that there was concern that Child was being overmedicated or drugged by Mother following a tonsillectomy, but that counsel had advised Paternal Grandmother that she should not have done that. (*See id.* at 15).

Following the hearing, the court granted Mother's petition for emergency custody, finding that Paternal Grandmother's drug testing of Child was without merit and improper. Father's periods of supervised custody were changed so that they would occur at the courthouse through the Westmoreland County's Family Reunification Program. The court granted Father's petition for contempt and provided him with five (5) make up days due to Mother's withholding Child. Additionally, the order addressed new issues raised

regarding Mother's fiancé, Mr. Law. The court ordered that Mr. Law should not drive with Child in his car, as he did not have a valid license. Additionally, the court appointed Dorean N. Petonic, Esquire, as Child's guardian *ad litem* ("GAL"), to assist the court in determining the best interests of Child.[2]

On January 29, 2025, following a review hearing, the court ordered that Mother continue to have sole legal and primary custody of Child; Father to have partial supervised custody of Child through the Westmoreland County Family Reunification Program; that in the event Father obtained enrollment in Soberlink or a similar program the matter would be rescheduled to address removal of the supervision requirement; that Father should continue in outpatient drug/alcohol counseling, individual counseling and Alcoholics Anonymous meetings; that Mr. Law should not be alone with Child, nor participate in scheduling partial custody with Father, or be in the presence of Child when Father was on the phone with Child.

On February 6, 2025, following a hearing, the court granted Paternal Grandmother's petition to intervene, pursuant to 23 Pa.C.S.A. § 5325(2)(i) and (ii). On February 24, 2025, Paternal Grandmother filed a petition to modify the January 29, 2025, seeking periods of partial custody.

On April 29, 2025, the court entered an order directing that Mother would continue to have sole legal and primary physical custody of Child;

---

[2] Attorney Petonic's appointment order provided that the appointment would terminate upon entry of a final order resolving the pending petition, or as provided in subsequent orders of the court.

Father would continue to have supervised physical custody of Child; and Paternal Grandmother was awarded partial physical custody of Child on Saturdays from 10:00 a.m. to 6:00 p.m., and Father was not to be present during this custodial time. As well, Paternal Grandmother was to have reasonable telephone contact and/or video chats with Child while in Mother's physical custody.

On May 5, 2025, following a review hearing, the court ordered that Mother should continue to have sole legal and primary physical custody of Child, that Mother must keep Father informed of all issues concerning Child, and that Father shall have access to Child's school records and be able to consult with Child's school. Mother was ordered to re-enroll Child in Southmoreland School District within 5 days, and within 30 days, have Child residing in Westmoreland County in the Southmoreland School District, subject to threat of a bench warrant. The order further provided that if Mother wished to relocate with Child, she must file an appropriate relocation petition. The court granted Father partial physical custody every other Saturday from 10:00 a.m. to 6:00 p.m. at Paternal Grandmother's home, and directed Father to enroll in Soberlink or a similar program. The court granted Paternal Grandmother partial physical custody every other Saturday from 10:00 a.m. until 6:00 p.m., with at least one weekly telephone call with child on Wednesday evenings at 7:00 p.m. or any other date the parties agreed, and Father could be present for such calls. Paternal Grandmother was prohibited from administering any form of drug test on Child, and in case of emergency

should seek medical attention for Child.

Almost immediately after the hearing, that same day, Paternal Grandmother filed a petition for emergency relief, which the court denied that same day. Paternal Grandmother also filed a petition for contempt.

On May 12, 2025, Father filed a petition for contempt, and a petition seeking emergency relief. Additionally, that same day, Paternal Grandmother filed a petition for contempt alleging that Mother had withheld Child for a Saturday visit.

On May 14, 2025, the court issued an order finding that Mother had failed to comply with the earlier order regarding re-enrolling Child in the Southmoreland School District and issued a bench warrant for Mother.

The court convened a pretrial hearing on June 11, 2025. At this hearing, Paternal Grandmother argued that there were Kayden's Law[3] concerns regarding Mr. Law and prior Florida convictions and/or citations for cruelty to animals. Paternal Grandmother attempted to introduce evidence that Mr. Law had made terroristic threats to a minor, but the matter had been *nolle prossed*. (**See** N.T. Hearing, 6/11/25, at 12-13). Mother additionally mentioned concerns that Father had violated the PFA entered against him, and that Paternal Grandmother had taken Child's urine so her other son could pass a drug test. As well, the court interviewed Child *in camera*.

On June 16, 2025, the court entered an order that continued the

---

[3] **See** Act of April 15, 2024, P.L. 24, No. 8 (known as "Kayden's Law"), effective August 13, 2024. We discuss Kayden's Law in more detail **supra**.

petitions for contempt and directed Mother to file a petition for relocation, and Father to file an objection, if he was still opposing relocation. The court ordered that the provision that Child should not be left alone with Mr. Law remain in effect.

On June 18, 2025, Father filed yet another petition for contempt, asserting that Mother had refused to allow Father to spend time with Child on his birthday and Father's Day. On June 26, 2025, Paternal Grandmother filed a petition for contempt asserting that Mother had not moved back to Westmoreland County or filed a petition to relocate. On June 30, 2025, Mother filed a notice of proposed relocation. On July 2, 2025, the court vacated the bench warrant. On July 14, 2025, Father filed an objection and counter-affidavit regarding the proposed relocation. On July 28, 2025, Paternal Grandmother also filed an objection regarding the proposed relocation.

On August 5, 2025, the court convened a custody review hearing and hearing on the petitions for contempt and for relocation. During this hearing, the court questioned Father about an incident where he called Child "a little f---er" when she did not say "I love you" back to him during a phone call. (**See** N.T., 8/5/25, at 13-14). Father denied saying this, despite the fact that the GAL had memorialized the incident in a report after speaking to Child and Mother.

That same day, the court entered an order stating that the petition for relocation was moot, as Mother was withdrawing her petition and moving back to Westmoreland County; for the 2025-26 school year and until further order,

Child would be enrolled in the South Moreland school district. The court dismissed the petitions for contempt. The court directed that Mother and Father would have shared legal custody of Child, Mother would have primary physical custody of Child, and Father and Paternal Grandmother would have partial physical custody of Child. Mr. Law was still not to be left alone with Child or to be referred to as Child's stepfather or father. All parties were prohibited from smoking around Child. Additionally, the custody order provided a more detailed holiday custody schedule.

On August 8, 2025, Father filed a litany of complaints, accusing Child's GAL, Attorney Petonic, of misconduct and failure to act regarding concerns raised by Father and Paternal Grandmother about Mr. Law and his relationship with Child. On August 11, 2025, Paternal Grandmother filed a petition for emergency relief, raising concerns regarding Mr. Law referring to Child as his daughter and other such issues. That same day, Paternal Grandmother filed another petition for contempt, averring that she had overheard Mr. Law call Child his daughter, and that Mother had encouraged Child to call Mr. Law "Dad" in violation of court orders. Additionally, Paternal Grandmother filed a written response to the GAL's report.

On August 15, 2025, Father filed a petition for emergency relief, asserting that Mother was due to give birth imminently and had not submitted a plan for the care of Child during her hospitalization and postpartum recovery. That same day, the court denied the petition because no immediate emergency existed. Further, that same day, Father filed a petition seeking a

court-ordered psychological evaluation of Child.

On August 18, 2025, Paternal Grandmother filed a request for *in loco parentis* status, which the court denied. On August 19, 2025, Paternal Grandmother filed a written addendum to her petition for contempt, alleging several incidents in which Mr. Law had referred to Child as his daughter. That same day, Mother filed a petition for emergency relief, asserting among other claims that Mother was frightened for Child's safety, as she had been left alone in the pool, and that Child had smelled of cigarettes and had not been showered over the weekend. Additionally, that same day, following a hearing, the court entered an order decreeing that Mother should continue to pursue counseling through the school for Child and that Father could seek an independent evaluation at his own expense.

On August 21, 2025, Mother filed a petition for emergency relief alleging that on August 20, 2025, Child had been taken from school without her permission, and that, when she had attempted to retrieve Child, Paternal Grandmother attempted to run her over with her car. Following a confrontation, Mr. Law broke the window of the car and Father allegedly hit Mr. Law. The police were called, and Child, who had been cut by glass, was taken to the local hospital for treatment. Mother requested that visits be suspended, and that Father and Paternal Grandmother not be allowed to take Child from school without Mother's permission. That same day, the court awarded Mother sole physical and legal custody pending a hearing on the various petitions for relief.

That same day, Father filed his own petition for emergency relief, providing his version of events and requesting custody of Child and for a no-contact order as to Mr. Law. The court denied Father's petition after speaking with the Westmoreland County Children's Bureau ("the Bureau").

On August 22, 2025, Paternal Grandmother filed an objection to Mother's petition for emergency custody, and an affidavit regarding her version of the events of August 20, 2025. On August 26, 2025, Father filed additional affidavits and requested that the court dissolve the emergency custody order. The court denied the petition, noting that Father could raise those issues at the emergency hearing.

On September 11, 2025, Father filed a petition for contempt, arguing that Mother engaged in a willful pattern of violations and obstructions, undermining the court's authority and placing Child at risk.

On September 12, 2025, the court convened for hearings on the various emergency petitions that had been filed. At the hearing, Rachel Winiesky, a caseworker from the Bureau, testified regarding the August 20, 2025 incident. Ms. Winiesky stated that the Bureau had been contacted regarding Mr. Law breaking the window of Paternal Grandmother's car, and that she had investigated and interviewed Child on August 21, 2025. Child informed Ms. Winiesky that she did not feel safe with Father because he slammed her against the car seat or back of the car and had kidnapped her. On September 11, 2025, Ms. Winiesky conducted home visits at both homes, which she found appropriate for Child and without safety concerns. Child stated that she "kind

of" feels safe with Father but repeated that he had slammed her against the back of the seat and that she had been kidnapped. (**See** N.T. Hearing, 9/12/25, at 8, **see also** N.T. *In Camera* Hearing, 9/12/25, at 17).

The court interviewed Child *in camera* about the August 20, 2025 incident,[4] and both Mother and Father testified regarding their version of the events. Further, Father admitted to knowingly violating the court's custody order. Additionally, Attorney Petonic testified regarding her home visits, namely that both homes were appropriate, and that Child was very comfortable with Mother and Mr. Law, and that she vacillated between feeling comfortable with Father and Paternal Grandmother.

That same day, following the hearings, the court entered an order granting the emergency petitions and providing that Mother and Father were to have shared legal custody, Mother to have primary physical custody of Child, and Father and Paternal Grandmother to share partial physical custody of Child. The order provided no party should exit their vehicle during custody exchanges, and Mr. Law was not to be present during custody exchanges. Mr. Law was ordered to provide the court with a printout of any criminal charge

_____

[4] Child stated that during the incident, she was sad and confused when Father shoved her back in her car seat, and that she wanted to leave the car and go to Mother. When Mr. Law punched the window, Child stated that she was scared but not "super scared" because she knew Mr. Law was trying to get her out. (**See** N.T. *In Camera* Hearing, 9/12/25, at 24-25). Child stated that she wanted to stay with Mother, partially because of her little sister, and partially because of "all of this stuff that happened." (**See id.** at 27). Child then stated that she did not want to see Father or Paternal Grandmother. (**Id.** at 28). However, she conceded that if Mother and Father did not fight, she would want to see Father. (**Id.** at 28).

that has been filed against him in any state in the United States. The court directed that all parties must follow all recommendations from the Bureau; no party shall smoke, consume alcohol, or take any drugs while Child is in their physical custody, and Mr. Law and his mother shall not be left alone with Child. The court further noted that Child had been given her own phone and could initiate reasonable phone contact with parents.

On October 14, 2025, Mother filed a petition for emergency relief, asserting that Child had been lying in bed with Paternal Grandmother and found a loaded gun under the pillow, and that Paternal Grandmother and Father had not allowed her access to her cell phone. That same day, the court entered an order providing that all parties shall secure all firearms in a locked box and that Child shall sleep in her own bed.

On September 29, 2025, the Bureau issued a finding regarding its investigation of the August 20, 2025 incident. Both Mother and Mr. Law were indicated as perpetrators of child abuse. The caseworker recommended, and Mr. Law and parents agreed to participate in, the following recommended services: anger management for Mr. Law and co-parenting for Mother and Father.

On October 30, 2025, the court convened for a custody trial. At the trial, the following witnesses testified: Brandy Trout, a Westmoreland County Children's Bureau supervisor;[5] Marc Vrane, a Bureau caseworker; Child;

---

[5] Ms. Winiesky could not testify at the custody trial because she had called in sick that day.

Mother; Mr. Law; Tina McBride, Mr. Law's mother; Father; Paternal Grandmother; and Attorney Petonic.

Ms. Trout testified regarding the Bureau's investigation and Ms. Winiesky's involvement. Ms. Trout stated that, based upon the August 20, 2025 incident in which the car window was broken, Ms. Winiesky had indicated the case for child abuse under the category of creating a reasonable likelihood of bodily injury, and that the perpetrators were Mother and Mr. Law. Ms. Trout also testified that Mr. Law had explained that he had punched the window to get to Child and admitted breaking the window. Mother had expressed concerns that Father had previously kidnapped Child and that he would take off with her. At the time of the custody trial a criminal investigation remained ongoing by Pennsylvania State Police. Ms. Trout stated that Ms. Winiesky had referred the parties for services, including anger management for Mr. Law, coparenting for Mother and Father, and connection to community mental health resources for Mother, if needed.

Mr. Vrane testified that he is an assessment caseworker for the Bureau. He testified regarding a referral he had received, in which Child reported finding a firearm under the pillow on Paternal Grandmother's bed, where she was sleeping. Father had a felony conviction and was not allowed to possess firearms, there had been three PFA orders against Father, and recently Father had "put hands" on Child, as well as made threats to shoot Mother. (*See* N.T. Trial, 10/30/25, at 14). Additionally, there were reports that both Father and Paternal Grandmother smoke cigarettes in the home with Child. Mr. Vrane

testified that he had interviewed Child about the incident with the gun, and she stated that it was silver with a black outline. At the time of trial, the investigation was ongoing.

The court interviewed Child *in camera* regarding her living situations at both parents' homes. Child testified that Mother primarily cares for her, takes her to medical appointments, and comforts her when she is sick or scared. Child testified that she would not want to spend more custodial time with Father, because she does not get to see Mother as much as she would like, due to school and weekend custodial periods. As well, the court again interviewed Child about the incident with the gun, the incident where Paternal Grandmother had her urinate in a cup, and the August 20, 2025 car incident. Child also stated that she had witnessed Father slapping or hitting Mother between 5 and 10 times, and that Father had thrown a beer can at or near her and splashed her with liquid. Child testified she does not call Father because he did not give her his phone number.

Mother testified that she works part-time from home, doing online surveys, and that she intends to seek work outside the home once her youngest child is a little older. She testified regarding the history of her relationship with Father, including his history of drinking and physical abuse that resulted in the filing of multiple PFA petitions. Additionally, Mother testified regarding an incident in 2023, when Father took Child for 10 days and told Mother she would not get Child back unless she took Father back as a romantic partner. Later, Mother discovered that Father had taken Child to

his brother, Benjamin Kelso's, house. Mother explained that this incident was why she reacted the way she did on August 20, 2025, despite there being a custody order in place at the time. When asked about her mental health issues, Mother stated that she has post-traumatic stress disorder ("PTSD") from various traumatic incidents in her life, and that she intends to pursue individual counseling as well as coparenting counseling. While cross-examining Mother, Father began to question her about an incident where he had been in a coma.

Mr. Law testified regarding his criminal history. On July 10, 2018, Mr. Law received a ticket for careless driving in Hillsborough County, Florida, and paid the fine for that ticket. In June and July 2019, Mr. Law was charged in Hillsborough County, Florida, with a second-degree felony for a written threat to kill or do bodily injury, but the charge was reduced to a misdemeanor class two assault and ultimately *nolle prossed*. On March 6, 2020, Mr. Law paid a fine for having a front seat passenger over the age of 18 not being seat belted. On September 16, 2020, he received a non-criminal civil citation for cruelty to animals in Hillsborough County. Mr. Law explained the charge and stated that he had relocated and asked someone to take care of the dog, but they did not; ultimately, the dog was left in a house with no food or water for three days. Mr. Law admitted that he had been convicted on that charge. An additional animal cruelty charge had been voluntarily dismissed. On June 21, 2022, Mr. Law received a ticket in Hillsborough County, Florida, for operating a motorcycle with a suspended license; the ticket was later *nolle prossed*. Mr.

Law denied having any other criminal convictions in any other state.

Mr. Law denied ever asking Child to refer to him as her father and stated that he has told her not to call him dad. However, Mr. Law stated that he did refer to Child as his daughter because he has been in her life for over a year, takes care of her, supports her, and helps her with schoolwork. Mr. Law stated that he had been involved with a woman who had two children for whom his paternity was established, but his parental rights to those children were terminated.

Ms. McBride testified that she is Mr. Law's mother. Mr. Law, Mother, and Child live with her in Scottdale, a borough in Westmoreland County. Ms. McBride testified regarding her own criminal history. This included certain traffic violations, namely speeding tickets, seatbelt violations, and insurance violations in 2006, 2012, and 2013. Additionally, Ms. McBride had an "adjudication withheld" in 2010 for obtaining a property in return for a worthless check. (*See* N.T. Trial, 10/30/25, Ex. 5). In 2008, she was found indicated by a Florida children's agency. Ms. McBride testified that she has bipolar disorder and that at that time, her children were removed from her care. However, she is currently medicated, and her condition is under control. Additionally, on August 11, 2011, in Pinellas County, Florida, while Mr. Law was a minor, a family member filed for and obtained a final order of protection on his behalf against Ms. McBride, that would remain in effect for one year. Additionally, Ms. McBride testified that Mr. Law had been diagnosed with autism spectrum disorder.

Father testified that he lives with Paternal Grandmother and is self-employed delivering packages for companies such as GrubHub and Instacart. When asked by the court about the coma, Father stated that "last August" after "the first hearing," he got "extremely drunk and didn't plan on waking up" and he was placed in a medically induced coma. (*See* N.T. Trial, 10/30/25, at 144-45). Father stated that his blood alcohol content ("BAC") at the time was .83. After waking from the coma, Father decided that he would go to inpatient rehab. Father testified that he is currently taking Vivitrol shots to help him control his drinking and that the shots are effective but begin to wear off at the end of the month. Father testified that his only other medication is Adderall for attention deficit hyperactivity disorder ("ADHD"). Additionally, Father testified that he has been diagnosed with intermittent explosive disorder. Father is no longer attending therapy, beyond the brief counseling when receiving his shot, and occasional AA meetings on TikTok.

Father admitted that Mother makes the majority of Child's medical and dental appointments and takes her to them, and that Paternal Grandmother prepares Child's breakfast and lunch, although Father stated that he usually makes dinner. Father denied that Child ever brings schoolwork home. On cross-examination, Father admitted that he had a 2009 felony DUI and a 2009 conviction for simple assault in New Hampshire. Additionally, he had two indirect criminal contempt convictions for violating PFAs.

Paternal Grandmother testified that she has a disorderly conduct conviction from 1973. Paternal Grandmother testified she would like to have

a weekend alone per month with Child. On cross-examination, Mother again brought up the issue of Paternal Grandmother drug-testing Child; Paternal Grandmother denied that she had taken the urine to provide a clean sample for her son's drug test. Additionally, there was some testimony that her son, Benjamin Kelso, had lost custody of his own child.

Attorney Petonic testified that she became involved in the case in January 2025. At that time, Child seemed happy and did well in school. Child was very close with Mother and seemed less certain about Father. Mother's home has three bedrooms, in which Child has her own room, and the home is appropriate and maintained. Attorney Petonic noted the smell of cigarette smoke in Paternal Grandmother's home but both Father and Paternal Grandmother denied smoking when Child was there. Attorney Petonic spoke with Child again in June 2025 and Child did not indicate any real distress. However, in August 2025, there was a report that Father had called Child a rude name (the incident where Father called Child a "little f---er"), and Child confirmed this happened. After the August 20, 2025 incident, Attorney Petonic again met with Child to gather information. Her main concern was that Child had nine absences so far that school year, but six were excused and three occurred while Mother was hospitalized, first for injuries from a car accident and then when Mother gave birth to Child's half-sibling.

Attorney Petonic indicated that Paternal Grandmother asked her to contact Paternal Grandmother's sister, Sue Martin, and Paternal Grandmother's son, Benjamin Kelso, and his wife. Mrs. Martin did not have

any other firsthand information regarding the case, and Attorney Petonic was unable to reach Mr. Kelso or his wife because Paternal Grandmother did not provide a phone number for them.

Attorney Petonic felt that coparenting for parents, and anger management for Mother, would be beneficial; she noted that Father was receiving treatment for his alcoholism and therapy. Attorney Petonic stated that Child had the strongest attachment to Mother, and felt most secure with Mother. Attorney Petonic testified that Paternal Grandmother has been made aware that her role is solely as a grandmother, and that she could see Child during Father's periods of custody. Attorney Petonic expressed concerns about Mr. Law but noted that things will work well if he takes seriously the services provided by the Bureau and integrates them into his life. Attorney Petonic opined that Mother should remain the primary physical custodian, as Child always felt safe and secure with her, but has not always been sure of her safety with Father. At the conclusion of the hearing, the court held the matter under advisement.

On October 31, 2025, Father filed a "post-trial" statement, and Paternal Grandmother filed a response to the GAL's testimony and report, disputing both Attorney Petonic's conduct and factual findings. On November 12, 2025, the GAL filed an amended written report, addressing the custody factors and various safety concerns.

On November 18, 2025, Father filed a "supplemental safety statement," asserting that he had discovered a "sealed juvenile sexual offense entry"

regarding Mr. Law as well as other concerns. That same day, the court entered an order stating that the custody trial had been held October 30, 2025, the record was closed, and Father's request for review was denied.

On November 24, 2025, the court entered an order granting shared legal custody to Mother and Father; primary physical custody to Mother; partial physical custody to Father; and no separate period of partial custody to Paternal Grandmother. Since Father was living with Paternal Grandmother, Father could determine how much time Paternal Grandmother spent with Child. Specifically, the order provided for custody periods in the following manner:

> a. WEEK ONE – from Thursday, after school (or 4:00 p.m., if there is no school), until Sunday at 6:00 p.m.
>
> b. WEEK TWO -Wednesday from after school (or 4:00 p.m., if there is no school) until 8:00 p.m.
>
> c. WEEK THREE – from Thursday, after school (or 4:00 p.m., if there is no school), until Sunday at 6:00 p.m.
>
> d. WEEK FOUR - Wednesday from after school (or 4:00 p.m., if there is no school) until 8:00 p.m.
>
> e. The parties shall continue to rotate through this schedule.

(*See* Order, 11/24/25). Additionally, the order detailed the division of vacation time during the summer, and other necessary provisions for custody exchanges.

Among other specifications, the order provided that the parties must fully cooperate with the Bureau and follow all recommendations for services,

specifically: 1) Child shall continue individual counseling; 2) Father shall continue receiving treatment for his alcohol abuse, and follow any recommendations, including receiving Vivitrol shots as prescribed and attending Alcoholics Anonymous meetings; 3) Mother shall start individual counseling to address past trauma and assist with navigating everyday stresses; 4) Child shall not be alone with Mr. Law until he successfully completes anger management counseling provided through the Bureau; 5) Child shall not be left alone with Paternal Uncle, and shall not ride in a vehicle driven by Paternal Uncle; 6) both parties must permit Child to have phone contact with the other parent. The court issued a thorough and lengthy recitation of the history of the matter and explanation for its custody decisions. (*See* Explanation of Decision, 11/24/25, at 1-39).

On December 22, 2025, Father timely filed a *pro se* notice of appeal,[6] without a concise statement, in violation of Pa.R.A.P. 1925(a)(2)(i). On December 23, 2025, the court ordered Father to file a concise statement of errors complained of on appeal; on January 12, 2026, Father complied.[7] On January 29, 2026, the trial court sent this Court a letter further addressing

---

[6] Paternal Grandmother filed a separate appeal, docketed at No. 1644 EDA 2025; this appeal was dismissed due to an inadequate brief on June 20, 2026. *See Kelso v. Kelso v. Sirochman Kelso*, No. 1644 EDA 2025 (Pa.Super. filed Jun. 20, 2026) (unpublished memorandum).

[7] *See In re K.T.E.L.*, 983 A.2d 745 (Pa.Super. 2009) (declining to quash or dismiss appeal based on mother's failure to file concise statement contemporaneously with notice of appeal where such failure did not prejudice parties).

the issues raised in Father's concise statement.

On appeal, Father raises the following issues for our review:

1. Did the trial court err and abuse its discretion by refusing to incorporate the CYS "safety plan" into the custody order, creating an unenforceable safeguard in violation of 23 Pa.C.S.[A.] §§ 5328 and 5329?

2. Did the trial court violate [Father's] due process rights by conducting a *sua sponte*, *ex parte* investigation into a non-party's criminal history outside the record, imposing restrictions based on that investigation?

3. Did the trial court abuse its discretion by dismissing Mother's unauthorized relocation as "moot," failing to apply the mandatory custody and relocation factors under 23 Pa.C.S.[A.] §§ 5328(a) and 5337?

4. Did the trial court abuse its discretion and capriciously disregard competent evidence by making a factual finding that [Father] had a blood-alcohol concentration (BAC) of 0.83—a level inconsistent with continued consciousness and functioning—without any expert medical testimony or corroborating evidence?

5. Did the trial court's repeated reliance on "the record speaks for itself" frustrate appellate review and fail to satisfy the reasoning requirements of 23 Pa.C.S.[A.] § 5323(d)?

6. Did the trial court exhibit bias and abuse its discretion through cumulative procedural errors, including prejudging the outcome, threatening fines for advocacy, and applying unequal evidentiary standards?

(Father's Brief at 3-4).[8]

_____

[8] On May 29, 2026, Father filed an application for relief, alleging that the GAL, Attorney Petonic, had improperly entered her appearance in the appeal despite the fact that her duties as GAL had been terminated after the entry of the final order. Father requested that this Court resolve the issue of whether
*(Footnote Continued Next Page)*

Preliminarily, we note that appellate briefs and reproduced records must materially conform to the requirements of the Pennsylvania Rules of Appellate Procedure. Pa.R.A.P. 2101. "[I]f the defects are in the brief or reproduced record of the appellant and are substantial, the appeal ... may be quashed or dismissed." *Id.* **See also** Pa.R.A.P. 2111 (regarding required content of appellate brief).

> Although this Court is willing to liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon the appellant. To the contrary, any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing.

*In re Ullman*, 995 A.2d 1207, 1211-12 (Pa.Super. 2010), *appeal denied*, 610 Pa. 600, 20 A.3d 489 (2011) (some internal citations omitted), *overruled in part on other grounds by* **In re Ajaj**, ___ Pa. ___, ___, 288 A.3d 94, 109 (2023). **See also** Pa.R.A.P. 2114-2119 (addressing specific requirements of each subsection of appellate brief). As well, "[t]his Court will not act as counsel" for an appellant who has not substantially complied with the Rules of Appellate Procedure. **Bombar v. West American Ins. Co**., 932 A.2d 78, 93

---

Attorney Petonic is authorized to appear and act as a GAL in this appeal and to clarify the status of any further filings.

The record reflects that Attorney Petonic's appointment order states that her appointment terminates upon the entry of a final order. (**See** Order Appointing Guardian *Ad Litem*, 1/15/25). We note that Attorney Petonic merely filed on appeal a statement of "no brief to be filed" and has taken no further action in the instant appeal. Under these circumstances, we deny Father's application for relief.

(Pa.Super. 2007).

Importantly, where an appellant fails to properly raise or develop his issues on appeal, or where his brief is wholly inadequate to present specific issues for review, a court will not consider the merits of the claims raised on appeal. **Butler v. Illes**, 747 A.2d 943 (Pa.Super. 2000) (holding appellant waived claim where she failed to set forth adequate argument concerning her claim on appeal; appellant's argument lacked meaningful substance and consisted of mere conclusory statements; appellant failed to cogently explain or even tenuously assert why trial court abused its discretion or made error of law). **See also Lackner v. Glosser**, 892 A.2d 21 (Pa.Super. 2006) (explaining appellant's arguments must adhere to rules of appellate procedure, and arguments which are not appropriately developed are waived on appeal; arguments not appropriately developed include those where party has failed to cite any authority in support of contention).

Instantly, although Father's brief comports generally with the structure required by the Rules of Appellate Procedure, his argument is woefully inadequate and consists of conclusory statements, and case citations without appropriate quotations, pinpoint cites, or any explanation of how the cited authority is relevant to his appeal. As well, Father fails to point to specific places in the voluminous record where we may find support for his arguments. **See Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa.Super. 2007) (stating: "[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent

- 24 -

discussion, with references to the record and with citations to legal authorities"); Pa.R.A.P. 2119(c), (d). Accordingly, Father risks waiver of his issues on appeal. Nevertheless, as the trial court has attempted to address Father's issues and we may discern the issues raised for purposes of appeal, we decline to find a wholesale waiver of all issues.

Father's issues collectively attack the trial court's ruling in this custody matter, as well as certain procedural and evidentiary issues that arose during the proceedings. The following principles apply to our review of a custody order:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 457-58 (Pa.Super. 2021) (quoting *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa.Super. 2018)).

> [I]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party.

***E.B. v. D.B.***, 209 A.3d 451, 468 (Pa.Super. 2019) (quoting ***King v. King***, 889

A.2d 630, 632 (Pa.Super. 2005)).

> With any child custody case, the paramount concern is the best interests of the child.  This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

***M.J.M. v. M.L.G.***, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa.

710, 68 A.3d 909 (2013) (quoting ***J.R.M. v. J.E.A.***, 33 A.3d 647, 650

(Pa.Super. 2011)).

> The parties cannot dictate the amount of weight the trial court places on the evidence.  Rather, the paramount concern of the trial court is the best interest of the child.  Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting ***S.M.***

***v. J.M.***, 811 A.2d 621, 623 (Pa.Super. 2002)).

The Child Custody Act provides, in relevant part:

### § 5323. Award of custody

**(a) Types of award**.--After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

\* \* \*

**(e) Safety conditions.--**

(1) After considering the factors under sections 5328, 5329[9] (relating to consideration of criminal conviction), 5329.1 (relating to consideration of child abuse and involvement with protective services)[10] and 5330 (relating to consideration of criminal charge), if the court finds a history of abuse of the child or a household member by a party or a present risk of harm to the child or an abused party and awards any form of custody to a party who committed the abuse or who has a household member who committed the abuse, the court shall include in the custody order:

(i) The safety conditions, restrictions or safeguards as reasonably necessary to protect the child or the abused party.

(ii) The reason for imposing the safety conditions, restrictions or safeguards, including an explanation why the safety conditions, restrictions or safeguards are in the best interest of the child or the abused party.

---

[9] None of the types of criminal convictions listed in 23 Pa.C.S.A. § 5329 are relevant or applicable to the instant matter.

[10] Among other factors, the court shall determine whether the child is the subject of an indicated or founded report of child abuse, whether a party or member of the party's household has been identified as the perpetrator in an indicated or founded report of child abuse, the date and circumstances of the child abuse, and the jurisdiction where the investigation took place. *See* 23 Pa.C.S.A. § 5329.1(a)(1)(i)-(iv).

(iii) The reasons why unsupervised physical custody is in the best interest of the child if the court finds that past abuse was committed by a party.

23 Pa.C.S.A. § 5323(e).

The Child Custody Act further provides:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In Father's first issue, he contends there were allegations of abuse or risk raised during the custody trial and that as a result, the trial court was required to assess the risk and ensure that the custody order protects Child.[11] According to Father, this requires substantial weighed consideration of safety facts, which he insists the court inappropriately disregarded. Father avers that this created an "unenforceable 'phantom' safeguard" in violation of the Custody Act. (*See* Father's Brief at 8-9). Father argues that because there is no safety plan in the custody order, it does not legally exist, and that he cannot file appropriate pleadings if the safety plan is not followed. Father concludes the court abused its discretion on these grounds, and this Court must grant relief. We disagree.

Initially, we observe:

> Section 5328(a), along with other domestic relations provisions, was amended pursuant to Act of April 15, 2024, P.L. 24, No. 8 (known as "Kayden's Law"), effective August 13, 2024. Kayden's Law expands the factors to be considered in the custody court's best interest analysis and now requires the court to give "substantial weighted consideration" to, *inter alia*, the "safety of the child," which is defined in Kayden's Law as including "the physical, emotional and psychological well-being of the child," and

---

[11] As previously mentioned, Father's brief is somewhat deficient. Specifically, Father does not detail or specify what allegations of abuse or risk were raised at trial. Nevertheless, as best we can discern, Father is referencing here the August 20, 2025 incident in which Father and Paternal Grandmother removed Child from school in violation of the court's custody order, resulting in an altercation in which Mr. Law punched or kicked in the window of Paternal Grandmother's car.

any "[v]iolent or assaultive behavior committed by a party."
Act of April 15, 2024, P.L. 24, No. 8, §§ 2-3 (as amended
23 Pa.C.S. §§ 5322(a), 5328(a)). **These changes do not
undermine the court's custody determination based
on other applicable Section 5328(a) factors.**

***Velasquez v. Miranda***, ___ Pa. ___, ___, 321 A.3d 876, 886 n.6 (2024)
(emphasis added). As well, Kayden's Law amended Section 5323(e) of the
Child Custody Act, which states that if a court grants custody to a parent with
a history of abuse, it must implement safety precautions and explain why the
award is in the child's best interest. ***See*** 23 Pa.C.S.A. § 5323(e).

Instantly, regarding the August 20, 2025 incident, we repeat that Child
suffered abrasions to the hand as a result of this altercation. Ultimately, the
Bureau found that Mr. Law and Mother were indicated as perpetrators of child
abuse for that incident. Nevertheless, the Bureau did **not** find it necessary to
remove Child from Mother's home; instead, it referred all parties for services,
including anger management for Mr. Law, coparenting for Mother and Father,
and resources for mental health assistance for Mother, if needed. Notably,
Father does not address the safety concerns raised by his own actions,
including the three PFAs that were granted to Mother against him and Child's
testimony that Father had slapped or hit Mother multiple times in Child's
presence.

In its explanation for its custody decision, the trial court discussed the
first two custody factors as follows:

> ...the [c]ourt first looked at which party was more likely to
> ensure the safety of the child. This is a difficult factor for
> the [c]ourt because the [c]ourt has concerns about [Child's]

safety with regard to all the parties to this action.

As to Mother, there was a recent incident in which there was a dispute over custody of the minor child and Mother's fiancé punched/kicked in the window of the car [Child] was riding in[,] covering [Child] in broken glass. As previously discussed, Mother and her fiancé have been indicated as perpetrators of abuse pursuant to 23 Pa.C.S.A. § 6304(b.1)(5). The [c]ourt believes those indications are going to be appealed. While it was Mother's fiancé that broke the window, the [c]ourt has concerns about Mother's ability to control her fiancé and his behaviors around [Child].

In the case of Father, he has been addressing his issues with alcohol for the last year and a half. He has been sober approximately one year and a few months but his rock bottom moment occurred in August of 2024, and it resulted in him being admitted to the hospital and placed in a medically induced coma with a blood alcohol content of .83. While the [c]ourt applauds Father for his efforts and continued sobriety since the incident and inpatient treatment, the [c]ourt has concerns because while Father is receiving a Vivitrol shot monthly, his intensive outpatient therapy ended in February of 2025 when his insurance stopped paying for it. He did testify that he occasionally attends AA Meetings online through TikTok. Additionally, the [c]ourt has concerns because Father was diagnosed with Intermittent Explosive Disorder by Forge Health but the only therapy he is receiving is when he is seen for his medication management appointment and that occurs every three (3) months. Father admits that he had been seeing a therapist but that ended approximately five (5) months ago and he is not sure why.

Lastly, the [c]ourt has concerns about [Child's] safety with Paternal Grandmother based on a couple of incidents. First, back in December of 2024, Paternal Grandmother took a urine sample from [Child] during a supervised period of partial custody for Father for which Paternal Grandmother was the supervisor. At the time, Paternal Grandmother reported that she performed a drug test on [Child] because she believed that Mother overmedicated the child. Paternal Grandmother was removed as a supervisor for Father's periods of partial custody. However, during the trial, Mother

- 32 -

questioned Paternal Grandmother about her history of collecting clean urine to help her other son with his legal issues. While the [c]ourt does not know for sure that Paternal Grandmother was engaging in that behavior, the [c]ourt does have concerns that it is a possibility. Additionally, a more recent issue occurred prior to the trial with [Child] reporting that she was lying on Paternal Grandmother's bed and found a firearm under the pillow. The matter was CHILDLINED and is currently being investigated by the Westmoreland County Children's Bureau. The Court took the *in camera* testimony of [Child] at the time of trial and found that [Child] testified credibly. This matter is still being investigated, and the [c]ourt has included a provision in its Order that all firearms in all residences/places where [Child] could be spending custodial time shall be properly secured.

After reviewing the testimony here, the [c]ourt finds that this factor favors Mother because the Westmoreland County Children's Bureau has put services in the home to help Mother and her fiancé address the [c]ourt's concerns. They have ordered anger management counseling for Mother's fiancé and co-parenting counseling for Mother and Father. Additionally, the [c]ourt has ordered Mother to start individual counseling to address her past trauma, the instances of domestic violence, and the stresses of everyday life.

The [c]ourt then examined the present and past abuse committed by a party or members of the party's household including child abuse, violent or assaultive behavior and the level of cooperation and conflict between the parties including which party is more likely to encourage and permit frequent and continuing contact, and the attempts by a party to turn the child against the other party.

In the instant case, Mother had sought Protection from Abuse Orders against Father on three (3) separate occasions. In September of 2019, Mother filed a Protection from Abuse action against Father at 1643 of 2019-D. Said Petition for Protection from Abuse was granted … on September 16, 2019, with a temporary Order and was ultimately dismissed on January 24, 2020. Mother filed for a Protection from Abuse Order on August 7, 2023, which

resulted in a Final Protection Order being entered … for a period of three (3) years at 1289 of 2023-D. However, Mother withdrew the Protection Order on October 2, 2023. Lastly, Mother sought a Protection Order against Father on June 17, 2024. A one (1) year Final Protection Order was entered … at 982 of 2024-D. Said Order expired on July 2, 2025.[FN3]

> [FN3] Father filed a Petition to Strike Expired Protection from Abuse Order which was heard before Judge Schmizzi on September 18, 2025. After a full evidentiary hearing on the matter, Father's petition was denied.

The [c]ourt also heard testimony that Father had three (3) Indirect Criminal Contempt actions filed against him regarding the above Protection from Abuse Orders. The testimony is unclear as to two (2) of those Indirect Criminal Contempt actions, but it appears they were ultimately dismissed. However, on October 1, 2024, Father [pled] guilty to one (1) count [of] Violating a Protection from Abuse Order before Judge Walsh at 1213 MD 2024 and was sentenced to a period of probation not to exceed three (3) months. Father's probation period expired on January 8, 2025, and the Westmoreland County Adult Probation Office closed interest in his case.

It is additionally noted that Father sought a Protection from Abuse Order against Mother on June 9, 2025, which was denied by Judge Matthew Schimizzi. Per the statute, Father elected to have hearing on the denied Protection from Abuse Petition and that hearing was scheduled for June 24, 2025. On June 24, 2025, Judge Schimizzi denied the Protection from Abuse Petition for a second time.

The [c]ourt did not hear much testimony regarding the abuse alleged in those petitions from either Mother or Father. However, [Child] credibly testified *in camera* that she had seen Father physically hit Mother somewhere between five (5) and ten (10) times and these incidents occurred when the parties were arguing. She further testified that she had never seen her mother hit her father. As to involvement with protective services including the [Bureau,] the [c]ourt heard the testimony of Brandy

- 34 -

Trout[,] who is a supervisor with the Bureau, and she testified that both [Mr.] Law and Mother were indicated perpetrators of abuse due to the incident when the car window was smashed covering [Child] with broken glass. She stated that anger management counseling was put in place for Mr. Law and co-parenting counseling was being implemented for Mother and Father. Ms. Trout indicated that she had spoken with the Pennsylvania State Police and they are still actively investigating this matter. It is noted that all parties (including Mr. Law) were advised of their [Fifth] Amendment rights and warned of the potential consequences of testifying regarding this incident by this [c]ourt.

Additionally, the [c]ourt heard the testimony of Michael Vrane who is the Assessment Caseworker with the [Bureau] assigned to the parties' case involving the allegation that [Child] found a firearm under a pillow on Paternal Grandmother's bed. Mr. Vrane testified that his investigation was ongoing. He testified that Father and Paternal Grandmother were cooperative with him when he visited their home. He stated that [Child] reported that when [she] found the firearm, it took Paternal Grandmother a few seconds to realize what she had and then Paternal Grandmother took it away.

Regarding violent or assaultive behavior committed by a party, [Child] stated that Father had never physically hit her with his hand but one time last year, when he had been drinking beer, he threw a can of beer and some of the beer got on her.

No testimony was received regarding abuse or physical aggression on the part of the Paternal Grandmother.

(**See** Explanation of Decision, 11/24/25 at 22-23) (unpaginated, some footnotes omitted).

In its supplemental opinion, the court further explained:

The court heard the testimony from two Westmoreland County Children's Bureau caseworkers involved with the parties and the minor child. Ms. Trout testified extensively

- 35 -

as to the safety plan and services being implemented with Mother, her paramour and the minor child. The court believes that record on this issue speaks for itself. As to Appellant/Father's allegation that the court did not enter the safety plan into the record to make it enforceable, that is not the role of this court. The handling of the safety plan and its enforcement are within the purview of another judge here in Westmoreland County who handles those matters. If the safety plan is not followed, Appellant/Father can file appropriate pleadings to have such matters addressed.

(Supplemental Pa.R.A.P. 1925(a) Statement, 1/28/26, at 5) (unpaginated).

Our review of the record confirms that the court carefully and appropriately considered **all** safety concerns, as it ordered that Father shall continue receiving treatment for his alcohol abuse, that Mother shall start individual counseling to address her trauma and ability to manage everyday stressors, and that Child shall not be alone with Mr. Law until he successfully completes anger management counseling through the Bureau. To the extent that Father attempts to make an argument based upon Mr. Law's criminal history, the court heard extensive testimony and was able to examine various dockets and background check documents related to that history, as well as to observe Mr. Law's testimony regarding same. On this record, we cannot say that the trial court abused its discretion in both phrasing the order as it did, and in finding that these custody factors favored Mother. *See E.C.S., supra*.

In Father's second issue, he argues that the court violated his due process rights by conducting a *sua sponte* investigation into the criminal history of his brother, Benjamin Kelso. Father claims the court's reliance on

these "extra record" findings, without giving Father notice or an opportunity to "cross-examine" that evidence, deprived him of due process and destroyed the presumption of judicial neutrality. (Father's Brief at 9-10). Father concludes he is entitled to relief on these grounds. We disagree.

This Court has explained:

> The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law[.] A trial court has wide discretion in ruling on the relevancy of evidence and its ruling will not be reversed absent an abuse of discretion.

*K.T. v. L.S.*, 118 A.3d 1136, 1165 (Pa.Super. 2015) (citation omitted).

> We will not find an abuse of discretion merely because a reviewing court would have reached a different conclusion. Rather, appellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will.

*R.L. v. M.A.*, 209 A.3d 391, 395 (Pa.Super. 2019) (citations omitted and formatting altered).

Additionally, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or unduly prejudicial to the complaining party." *K.B. v. Tinsley*, 208 A.3d 123, 130 (Pa.Super. 2019) (citation omitted). *See also Renninger v. A & R Mach. Shop*, 163 A.3d 988, 999 (Pa.Super. 2017) (noting "[a]n evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the fact-finder's judgment").

The Pennsylvania Rules of Evidence provide, in relevant part:

**Rule 201. Judicial Notice of Adjudicative Facts**

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b) Kinds of Facts that may be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c) Taking Notice.** The court:

(1) may take judicial notice on its own; or

(2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

**(d) Timing.** The court may take judicial notice at any stage of the proceeding.

**(e) Opportunity to be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard[.]

Pa.R.E. 201. It is well-established that:

A court may take judicial notice of an indisputable adjudicative fact. A fact is considered indisputable if it is so well established as to be a matter of common knowledge. Conversely, a court cannot take judicial notice of a disputed question of fact. By taking judicial notice of a fact so commonly known, the court avoids the needless formality of introducing evidence to prove an incontestable issue.

*In Interest of D.S.*, 622 A.2d 954, 957 (Pa.Super. 1993) (citations and quotations omitted). For example, in criminal cases, a trial court may take judicial notice of convictions, as they are indisputable adjudicated facts. *See Commonwealth v. Taylor*, 137 A.3d 611, 617 n.1 (Pa.Super. 2016) (*en banc*) (citing *Commonwealth v. Brown,* 839 A.2d 433, 435 (Pa.Super. 2003)). As well, in civil cases, a court may take judicial notice of public documents when ruling on various pleadings. *See Solomon v. U.S. Healthcare Sys. of Pennsylvania, Inc.*, 797 A.2d 346, 352 (Pa.Super. 2002). *See also Deyarmin v. Consol. Rail Corp.*, 931 A.2d 1, 15 n.10 (Pa.Super. 2007) (taking judicial notice of publicly available dockets in cases currently pending before trial court).

Generally, however, our courts may not take judicial notice in one case of the records of another case. *Rumbaugh v. Beck*, 601 A.2d 319, 325 (Pa.Super. 1991). *See also Interest of G.E.*, No. 96 WDA 2025, unpublished memorandum at 17 (Pa.Super. filed Oct. 22, 2025)[12] (holding that trial court abused its discretion by taking judicial notice of criminal complaint and dependency petitions as evidence supporting involuntary termination of parental rights over mother's objections in termination matter, because these were records of other cases, even if contents of these documents were known to trial judge); *In re Adoption of P.G.D.W.*, No. 1741 MDA 2023, unpublished memorandum at 11-12 (Pa.Super. filed Jun. 27, 2024) (stating:

---

[12] *See* Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

"[a] court may not ordinarily take judicial notice in one case of the records of another case, whether in another court or its own, even though the contents of those records may be known to the court") (citation omitted).

Instantly, in its "examination of any other relevant factor," the court considered the criminal records of all parties involved, including Mr. Law, Ms. McBride, Mother, Father, and Paternal Grandmother, as well as Father's brother Benjamin Kelso (Child's paternal uncle). In doing so, the court noted:

> [S]ince the testimony revealed that Father had taken [Child] to her Paternal Uncle's home [when he absconded for 10 days], the [c]ourt did a criminal records check on him. It appears that Benjamin Kelso has ... several criminal cases mostly involving driving while under the influence. His cases span numerous counties and appear to be ongoing. [Child] shall not be left alone with Benjamin Kelso and shall not ride in a vehicle driven by Benjamin Kelso.

(*See* Explanation of Decision, 11/24/25 at 38-39) (unpaginated, some footnotes omitted). In its supplemental Pa.R.A.P. 1925(a) statement, the court further explained:

> [Father] alleges that the court violated due process by conducting its own *sua sponte* background check on [Father's] brother outside the courtroom, as admitted in the Explanation of Decision, and using that extra-record information to impose restrictions without providing [Father] an opportunity to cross-examine or rebut the evidence.
>
> As to [Father's] eleventh allegation, the court will note that this court can take judicial notice of any court proceedings. Paternal uncle, Benjamin Kelso, was made part of this case two separate times. First, during trial, paternal uncle's involvement was raised when [Child] and Mother both testified about [Father] taking [Child] and going to his brother's home, refusing to tell Mother where [Child] was

and refusing to return [Child] until Mother involved law enforcement.

Second, when [Paternal Grandmother] took urine from [Child] during a supervised period of partial custody with [Father]. Mother raised this issue through an emergency custody petition, and the court granted Mother's motion and ultimately removed Paternal Grandmother as a supervisor for [Father's] periods of partial custody. At trial, it was testified to that [Paternal] Grandmother had taken [Child's] urine to help Benjamin Kelso pass drug tests related to his own custody and/or criminal cases. It is noted that the court found [Paternal] Grandmother's testimony regarding Benjamin Kelso's cases to be deceptive.

If [Child] is going to be around someone who has lost custody of his own child and/or has a criminal record, and in this case it was testified to that Paternal Grandmother had a history of collecting urine so that her other son could use it for his criminal and custody cases, the court feels that it is in the best interest of [Child] to ensure the child's safety. The court reviewed the criminal dockets related to paternal uncle and decided that it was not in the minor child's best interest to be alone with him or to be in a car driven by him given his driving while under the influence cases. The court additionally notes that there were no restrictions imposed on [Father] in relation to the court's judicial notice of his brother's criminal record.

The only restriction put in place was against [Paternal Grandmother] early in the case, because she had the minor child urinate in a cup and claimed she was drug testing the minor child because she believed Mother was drugging/overmedicating [Child]. At the time of the restriction, the court had no information as to the paternal uncle having a case and it was only at the time of the trial that this testimony was presented to the court. Finally, the court will note that this restriction was lifted prior to trial when [Paternal] Grandmother intervened for periods of partial custody in her role as a grandparent. No further restrictions were implemented until the Final Custody Order. [Paternal] Grandmother was not awarded periods of partial custody for the reasons outlined in the court's Explanation of Decision.

(*See* Supplemental Pa.R.A.P. 1925(a) Statement, 1/28/26, at 4-5) (unpaginated).

Here, the court's consideration of publicly available criminal dockets was not akin to taking notice of records in another case. *Compare G.E., supra*. Rather, the legal issues surrounding Mr. Kelso were raised at the custody trial, the dockets were publicly available records, and the effect on the custody order was minimal.[13] *See Deyarmin, supra*. Accordingly, Father is not entitled to relief on this claim.

In Father's third issue, he contends that the trial court abused its discretion by "dismissing Mother's unauthorized relocation as 'moot,' failing to apply the mandatory custody and relocation factors under 23 Pa.C.S.[A.] §§ 5328(a) and 5337." (*See* Father's Brief at 10). According to Father, the court's action "signals that a parent can violate relocation laws and remove the child from the jurisdiction without consequence so long as they return before trial." (*Id.* at 11). Father concludes the court's error entitles him to relief. We disagree.

Once again, we reiterate that Father's brief is woefully deficient on this issue. *See Hardy, supra*. Accordingly, Father has waived this issue for purposes of appeal. Nevertheless, even if not waived, Father would not be

---

[13] Even if the court erred by considering this information, such error was harmless in light of the court's overall custody analysis and the minimal effect of this evidence on the custody order. *See In re Adoption of P.G.D.W., supra* (holding that court's improper taking of judicial notice constituted harmless error where court's ultimate termination decision was based on competent evidence).

entitled to relief.  We observe:

> As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot.  An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law.  In that case, an opinion of this Court is rendered advisory in nature.  An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect. ...
>
>       \*      \*      \*
>
> [T]his Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

*In re D.A.*, 801 A.2d 614, 616 (Pa.Super. 2002) (*en banc*) (internal citations and quotation marks omitted).  "The concept of mootness focuses on a change that has occurred during the length of the legal proceedings."  *In re Cain*, 527 Pa. 260, 263, 590 A.2d 291, 292 (1991).  "If an event occurs that renders impossible the grant of the requested relief, the issue is moot and the appeal is subject to dismissal."  *Delaware River Preservation Co., Inc. v. Miskin*, 923 A.2d 1177, 1183 n.3 (Pa.Super. 2007).  Importantly, "mootness, however it may have come about, simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so.  We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong."  *Spencer v. Kemna*, 523 U.S. 1, 18,

118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998).

Instantly, the court explained:

> [Father] alleges that trial court acknowledged that Mother relocated the child without consent but, instead of applying the mandatory analysis of 23 Pa.C.S.A. §5337, the trial court abused its discretion by ordering Mother to file a relocation petition retroactively, effectively sanctioning a violation of the law.
>
> The trial court has no further response as the Petition for Relocation became moot when Mother and the minor child moved back into Westmoreland County and Mother withdrew her Petition for Relocation.

(**See** Supplemental Pa.R.A.P. 1925(a) Statement, 1/28/26, at 5) (unpaginated).

The trial court is correct that the issue is moot: as Mother had moved back into Westmoreland County and re-enrolled Child in Southmoreland School District, there was no relocation petition to consider. **See In re D.A., supra**. Further, none of the exceptions that would allow this Court to consider a moot issue apply. **See id.** Finally, we cannot agree with Father's assertions that the trial court did nothing to sanction Mother regarding the unauthorized relocation. As the extensive procedural history of this case makes clear, the trial court entered numerous orders directing Mother to either move back to Westmoreland County, or to file a formal relocation petition; when she did not do so, the trial court issued a bench warrant for her arrest. As well, the court addressed Mother's conduct in its custody analysis. (**See** Explanation of Decision, 11/24/25, at 30) (unpaginated). Therefore, even if Father had

properly developed this claim, we cannot say the court erred by finding that Father's objections regarding Mother's relocation were moot. ***See Spencer, supra***.

In Father's fourth issue, he contends that the trial court abused its discretion and "capriciously disregard[ed] competent evidence by making a factual finding that [Father] had a [BAC] of 0.83." (***See*** Father's Brief at 11). According to Father, this BAC was not consistent with continued consciousness or functioning, without any expert medical testimony or corroborating evidence. Father claims, without citation to **any evidence of record**, or even outside of the record, that "medical literature generally recognizes that BAC levels near .40 are associated with coma or death, and a reported level of .83 is inconsistent with a person who is conscious and functioning." (***See id.*** at 12).

Again, we note that Father's failure to cite to **any** relevant authority results in waiver of this issue on appeal. ***See Hardy, supra***. Nevertheless, even if not waived, he would not be entitled to relief. As discussed ***supra***, the admission or exclusion of evidence is within the sound discretion of the trial court and will only be disturbed on appeal based upon an abuse of discretion or error of law. ***See K.T., supra***.

Instantly, the testimony regarding Father's BAC and his coma were all testified to by **Father** himself. Father made the following statements in open court:

> **FATHER**: Were we able to communicate, coparent during

last summer, up until the point when—

**MOTHER**: During the PFA.

**FATHER**: – I was – went to the hospital and was in a coma while we were supposed to be having our first custody hearing.

(**See** N.T. Trial, 10/30/25, at 93).

**THE COURT**: First thing that I questioned was, you asked something about when you were in a coma. Could you explain to me what that was about?

**FATHER**: Your Honor, last August when we had our first hearing, the night before, I got extremely drunk and didn't plan on waking up, and they medically induced me into a breathing tube thing. My alcohol content was extremely high. I **believe they said it was a .83**, and I was – I don't know how many days I was out. When I woke up, I realized what had happened and I had missed court, and that's when I decided I was going to put myself into rehab and start my journey of getting better and improving myself.

(**See** N.T. Trial, 10/30/25, at 144-45) (emphasis added). Father went on to explain, as the court questioned him, that he was in detox for about a week, including the medically induced coma, and then attended a 28-to-30-day inpatient rehab. (**See id.** at 146). Further, Father explained that he receives a Vivitrol shot monthly and described his ongoing medical care related to his alcoholism, as well as his diagnosis for ADHD. (**Id.** at 146-50).

The court explained:

[T]hat despite numerous hearings in this matter held before the trial, neither [Father] nor [Paternal] Grandmother ever felt it was important to bring to the court's attention that Father's alcoholism was at such a magnitude that he was put into a medically induced coma to save his life and that he continues to take the Vivitrol shot to address his alcohol use. The court will additionally note that it was [Father]

who presented this evidence to the court as is cited in [the] transcript. If [Father] had not presented said evidence during trial, the court would have never known about it as [Father] and [Paternal] Grandmother never disclosed this information.

(*See* Supplemental Pa.R.A.P. 1925(a) Statement, 1/28/26, at 5) (unpaginated, citations to the record omitted). Here, where Father testified that he was in a medically induced coma with a BAC of .83 and did not give the court any reason to believe that this statement was a mistake or inaccurate, we cannot say that the trial court erred or abused its discretion in relying on the testimony that Father himself gave in open court. *See K.T., supra*.

In Father's last two issues combined, he argues that the trial court's repeated statement that "the record speaks for itself" frustrates appellate review and fails to satisfy the mandates of 23 Pa.C.S.A. § 5323(d) (providing that court shall delineate reasons for its decision on record in open court or in written opinion or order). According to Father, the court did not provide adequate reasoning to explain its findings on safety such that this Court cannot verify whether "the mandatory factors of Kayden's Law were actually applied." (*See* Father's Brief at 13). Additionally, Father complains the court showed bias against him and had a predetermined outcome in mind for the case, and ignored evidence of third party-interference, which cumulatively amounted to an abuse of discretion. Father is not entitled to relief on these claims.

Again, we admonish Father for his failure to cite any relevant legal

authority to support these arguments or to places in the record where his issues occurred.[14] *See Hardy, supra*. Further, the trial court provided a thorough and thoughtful 39-page explanation of its decision, including an analysis of each custody factor. *See* 23 Pa.C.S.A. § 5323(d). We have already addressed the issue of Kayden's Law and the trial court's findings regarding the first two custody factors *supra*. The court also provided a detailed analysis of the remaining custody factors. (*See* Explanation of Decision, 11/24/25, at 27-39) (unpaginated). On this record, we cannot agree with Father's contention that the court failed to adequately explain its custody analysis.

Additionally, our review of the record makes clear the court did not

---

[14] For instance, Father argues that the court threatened to fine "Father's side" a hundred dollars for every inappropriate comment. However, Father neglects to mention that this admonishment occurred when Paternal Grandmother did not stop interrupting the proceedings during Father's testimony and questioning of witnesses. (*See* Father's Brief at 14; N.T. Trial, 10/30/25, at 187). Further, the court did not threaten to fine **Father**, only Paternal Grandmother—who is not a party to this appeal and who filed her own separate appeal.

In other issues, Father states that the court ignored his "timestamped email evidence regarding the GAL background check" while penalizing Father for failing to provide it, and the court consistently denied Father's contempt petitions "regarding Mother's denial of custody while granting Mother's filings without a hearing." (*See* Father's Brief at 14). Father does not elaborate on where in the record such issues occurred or further provide any context for his argument which is especially troubling considering the **litany** of contempt petitions filed by both Father and Paternal Grandmother at seemingly every turn. This Court will not act as Father's advocate. *See Bombar, supra*. Accordingly, to the extent that Father attempts to argue these specific points, he has waived them for purposes of appeal. *See Hardy, supra*.

exhibit bias in this case. To the extent Father argues that the court placed inappropriate weight upon specific evidence, the parties cannot dictate the amount of weight the trial court places on the evidence.[15] ***See R.M.G., supra***. In sum, the trial court appropriately considered the best interests of Child and fashioned a custody order with those interests in mind. ***See id. See also E.C.S., supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/4/2026

---

[15] For example, Father complains the court ignored or disregarded testimony from Father and Paternal Grandmother that Mr. Law had directed Child to call Mr. Law "dad." However, Mr. Law denied telling Child to call him "dad," and the record reflects that the court ordered Mr. Law to refrain from doing so in any event.